[29 NE3d 215, 6 NYS3d 206]

Julie Conason et al., Respondents, v Megan Holding, LLC, et al., Appellants.

Argued January 13, 2015; decided February 24, 2015

## POINTS OF COUNSEL

*Marino Partners LLP*, White Plains (*Umar A. Sheikh* and *Misha M. Wright* of counsel), for appellants. I. CPLR 213-a's clear and unambiguous four-year statute of limitations precludes respondents' action for residential rent overcharge because it is time-barred. (*Majewski v Broadalbin-Perth Cent. School Dist.*, 91 NY2d 577; *Cohen v Lord, Day & Lord*, 75 NY2d 95; *La Guardia v Cavanaugh*, 53 NY2d 67; *Commonwealth of the N. Mariana Is. v Canadian Imperial Bank of Commerce*, 21 NY3d 55; *Association of Contr. Plumbers of City of N.Y. v Contracting Plumbers Assn. of Brooklyn & Queens, Inc.*, 302 NY 495; *Matter of Capital Newspapers, Div. of Hearst Corp. v Whalen*, 69 NY2d 246; *Straus & Co. v Canadian Pac. Ry. Co.*, 254 NY 407; *Matter of Grimm v State of N.Y. Div. of Hous. & Community Renewal Off. of Rent Admin.*, 15 NY3d 358; *Matter*

of *Cintron v Calogero*, 15 NY3d 347.) II. The Appellate Division's judge-made law retroactively applied to appellants Megan Holding, LLC and Emmanuel Ku exacts an ex post facto law proscribed by article I, § 10 of the US Constitution. (*Rogers v Tennessee*, 532 US 451; *United States v Farris*, 448 F3d 965; *Weaver v Graham*, 450 US 24; *Ciafone v Kenyatta*, 27 AD3d 143; *Smith v Doe*, 538 US 84; *Landgraf v USI Film Products*, 511 US 244; *Calder v Bull*, 3 US 386; *Stogner v California*, 539 US 607; *Ross v Louise Wise Servs., Inc.*, 8 NY3d 478.) III. The Appellate Division erred in affirming that statutes of limitations are calculated backwards. (*Enrico & Sons Contr. v Bridgemarket Assoc.*, 252 AD2d 429.) IV. The Appellate Division erred in affirming the motion court's misapplication of collateral estoppel to the Civil Court's underlying findings of fraud on the dismissed rent overcharge counterclaim. (*Gramatan Home Invs. Corp. v Lopez*, 46 NY2d 481; *Kaufman v Eli Lilly & Co.*, 65 NY2d 449; *Petersen v Lysaght, Lysaght & Kramer*, 250 AD2d 581; *Alamo v McDaniel*, 44 AD3d 149; *Ryan v New York Tel. Co.*, 62 NY2d 494; *Comi v Breslin & Breslin*, 257 AD2d 754; *Pollicino v Roemer & Featherstonhaugh*, 277 AD2d 666; *Sahn v AFCO Indus.*, 192 AD2d 480; *Jackson v Board of Educ. of City of N.Y.*, 30 AD3d 57.) V. The Appellate Division erred in affirming respondents' failure to carry their heavy burden of a particularized showing that (1) Emmanuel Ku is Megan Holding, LLC's alter ego, who (2) used the LLC to commit a wrong against respondents, warranting the motion court's piercing of the corporate veil. (*First Bank of Ams. v Motor Car Funding*, 257 AD2d 287; *Sheridan Broadcasting Corp. v Small*, 19 AD3d 331; *Matter of Glenn [Redford]*, 233 AD2d 248; *Matter of Morris v New York State Dept. of Taxation & Fin.*, 82 NY2d 135; *Matter of Island Seafood Co. v Golub Corp.*, 303 AD2d 892; *Retropolis, Inc. v 14th St. Dev. LLC*, 17 AD3d 209; *TNS Holdings v MKI Sec. Corp.*, 92 NY2d 335; *Anderson St. Realty Corp. v RHMB New Rochelle Leasing Corp.*, 243 AD2d 595.) VI. The Appellate Division erred in affirming and finding that any of Emmanuel Ku's related corporations have any connection to respondents or the alleged transactions for rent overcharge, sufficient to pierce Megan Holding, LLC's corporate veil. (*Etex Apparel, Inc. v Tractor Intl. Corp.*, 83 AD3d 587; *John John, LLC v Exit 63 Dev., LLC*, 35 AD3d 540; *Matter of Glenn [Redford]*, 233 AD2d 248.)

*Fishman & Mallon, LLP*, New York City (*James B. Fishman* and *Susan K. Crumiller* of counsel), for respondents. I. Respondents' rent overcharge claim was timely interposed.

(*Thornton v Baron*, 5 NY3d 175; *Matter of Partnership 92 LP v State of N.Y. Div. of Hous. & Community Renewal*, 11 NY3d 859; *Matter of Grimm v State of N.Y. Div. of Hous. & Community Renewal Off. of Rent Admin.*, 15 NY3d 358; *Matter of Cintron v Calogero*, 15 NY3d 347; *Kirke La Shelle Co. v Armstrong Co.*, 263 NY 79.) II. The Appellate Division and the motion court correctly held that Megan Holding, LLC is collaterally estopped from challenging the Housing Court's findings of fraud. (*Feinberg v Boros*, 99 AD3d 219; *Schwartz v Public Adm'r of County of Bronx*, 24 NY2d 65; *Matter of Abady*, 22 AD3d 71; *Brown v Suggs*, 39 AD3d 395; *Pollicino v Roemer & Featherstonhaugh*, 277 AD2d 666; *Sahn v AFCO Indus.*, 192 AD2d 480; *Jackson v Board of Educ. of City of N.Y.*, 30 AD3d 57.) III. The unrefuted evidence establishes a rent overcharge, even without the Housing Court's findings of fact. (*Matter of Partnership 92 LP v State of N.Y. Div. of Hous. & Community Renewal*, 11 NY3d 859; *72A Realty Assoc. v Lucas*, 101 AD3d 401.) IV. The Court correctly upheld summary judgment on respondents' claim to pierce the corporate veil. (*James v Loran Realty v Corp.*, 20 NY3d 918; *Matter of Morris v New York State Dept. of Taxation & Fin.*, 82 NY2d 135; *Morpheus Capital Advisors LLC v UBS AG*, 105 AD3d 145; *Padilla v Edison Transp., Inc.*, 104 AD3d 518; *Brito v DILP Corp.*, 282 AD2d 320; *East Hampton Union Free School Dist. v Sandpebble Bldrs., Inc.*, 16 NY3d 775; *Cobalt Partners, L.P. v GSC Capital Corp.*, 97 AD3d 35; *Stewart Tit. Ins. Co. v Liberty Tit. Agency, LLC*, 83 AD3d 532; *Sound Communications, Inc. v Rack & Roll, Inc.*, 88 AD3d 523; *Fantazia Intl. Corp. v CPL Furs N.Y., Inc.*, 67 AD3d 511.) V. The Court correctly upheld the award of treble damages and attorney's fees. (*Matter of Miller v Division of Hous. & Community Renewal*, 289 AD2d 20.)

*Legal Services NYC*, Brooklyn (*Edward Josephson* of counsel), and *The Legal Aid Society*, New York City (*Adriene Holder* and *Ellen Davidson* of counsel), for Association for Neighborhood and Housing Development and others, amici curiae. I. The Appellate Division correctly applied this Court's holding in *Matter of Grimm v State of N.Y. Div. of Hous. & Community Renewal Off. of Rent Admin.* (15 NY3d 358 [2010]) when it remanded the proceeding below to the Division of Housing and Community Renewal to investigate the legality of the base date rent. (*Thornton v Baron*, 5 NY3d 175.) II. Reversal of the holding below would encourage evasion of the rent laws and contribute to loss of affordable housing in low and moderate income communities in New York City.

**OPINION OF THE COURT**

READ, J.

Julie Conason and Geoffrey Bryant (collectively, tenants) are the rent-stabilized tenants of an apartment in a residential building in Manhattan. Megan Holding, LLC is the building's owner and tenants' landlord. As described in this opinion, Conason asserted an overcharge claim against Megan in April 2009, almost 5½ years after she occupied the apartment under a vacancy lease. The principal issue on this appeal is whether CPLR 213-a's four-year statute of limitations completely bars this claim. Because of the unrefuted proof of fraud in the record, we conclude that section 213-a merely limits tenants' recovery to those overcharges occurring during the four-year period immediately preceding Conason's rent challenge, and that the lawful rent on the base date must be determined by using the default formula devised by the New York State Division of Housing and Community Renewal (DHCR or the agency) (*Thornton v Baron*, 5 NY3d 175 [2005, Smith and Read, JJ., dissenting]; *Matter of Grimm v State of N.Y. Div. of Hous. & Community Renewal Off. of Rent Admin.*, 15 NY3d 358 [2010, Smith, Graffeo and Read, JJ., dissenting]).

## I.

In October 2003, Conason signed a two-year lease, beginning on November 1, 2003, at a monthly rent of $1,800. The lease indicated that the legal regulated rent for the apartment was $2,000 per month, reduced to $1,800, "subject to any lawful adjustments," by virtue of a temporary rent concession rider. The lease did not include a rent stabilization rider as an attachment. This rider, required for vacancy leases subject to the Rent Stabilization Code, does not modify or become part of the lease. Instead, it notifies the rent-stabilized tenant of the prior legal regulated rent and explains how the vacancy lease's rent was computed (*see* 9 NYCRR 2522.5 [c] [1] [i]). Conason renewed the lease for two years, beginning November 1, 2005, at a monthly rent of $1,899; she signed another renewal lease for one year, beginning on November 1, 2007, at a monthly rent of $1,955.97. Conason paid rent in accordance with this lease for each month from November 2007 through May 2009.

### The Summary Proceeding

On April 9, 2009, Megan commenced a summary proceeding against Conason in Civil Court, Housing Part, for nonpayment

of rent; by answer dated April 24, 2009, Conason counterclaimed, as relevant here, for breach of the warranty of habitability and rent overcharge. In a decision and order dated June 24, 2009, Civil Court dismissed the proceeding without prejudice,[1] retained the counterclaim for breach of the warranty of habitability and declined to entertain the counterclaim for rent overcharge; by decision and order dated October 30, 2009, however, the Judge granted tenants'[2] motion to reargue and concluded that the rent overcharge counterclaim was, in fact, properly before him. Additionally, he allowed tenants, now represented by counsel, to amend their answer to add a counterclaim for attorneys' fees, and scheduled a trial date of December 9, 2009.

When the parties appeared on December 9th before another judge, Megan sought an adjournment for its new attorney to prepare for trial. This attorney was at least the third lawyer to represent Megan in the summary proceeding. Over tenants' attorney's objection, the Judge granted the adjournment on condition that Megan pay tenants $1,125 to ameliorate the legal expenses they had incurred on account of the eve-of-trial substitution. She also ordered Megan to correct multiple housing violations in tenants' apartment before the new trial date, January 20, 2010. The Judge heard testimony on that date, and on March 3, April 19 and 29, and June 10 and 11, 2010. She then adjourned the trial until July 27, 2010.

After the last trial day in June, Megan's attorney moved to withdraw. He apparently had informed Megan of his intention to do so several months earlier. By order dated July 26, 2010, the Judge granted the motion, expressing confidence that "retiring counsel believes in good faith that he cannot ethically continue as [Megan's] counsel"; however, she denied his request to adjourn the trial for replacement counsel to be brought on board and up to speed. At the time, Emmanuel Ku, the 99% shareholder in Megan, was on the witness stand pursuant to tenants' subpoena.

Ku appeared on July 27th to resume his testimony, but Megan had not substituted counsel. Civil Court, at the request

---

1. Megan's petition did not include a demand for rent after April 2009, and Megan conceded at trial that all rent had been paid through May 2009, thus satisfying the demand in its petition.

2. At some point during the course of this litigation, Megan added Bryant, Conason's husband, as a party. Conason and Bryant apparently were not married until after Conason's tenancy began.

of tenants' attorney, who wanted to avoid creating an appellate issue, then ordered a continuation of the trial for seven weeks, until September 15, 2010, to permit Megan time to engage a new lawyer. When Megan failed to do so, the Judge closed the record and set a date for posttrial briefs. An attorney described as Megan's "outside general counsel" submitted Megan's brief; this attorney had also appeared on July 26th to oppose Megan's then trial attorney's motion to withdraw.

In a decision and order dated April 8, 2011, Civil Court dismissed the overcharge claim, without prejudice, for failure of proof, commenting that "[a]lthough [tenants] established that an actionable overcharge occurred, they failed to prove the amount of the legal regulated rent and the amount of the overcharge." The Judge then explained why she had concluded that "an actionable overcharge" was shown; specifically, although Megan registered someone named Suzuki Oki with DHCR as the apartment's occupant under a two-year lease running from April 1, 2003 through March 31, 2005 at a monthly rent of $1,000, tenants had presented "persuasive evidence" that no one named Suzuki Oki had ever lived in the apartment.

First, a witness from the utility company testified that an electricity and gas account in the name of Candida Vasquez was closed by the tenant on May 30, 2003, and there was no active account for the apartment until Conason opened one on November 1, 2003. Second, the building's superintendent in 2003 testified that the apartment's last occupants before Conason were Vasquez and Jacobo Rivera; that no one lived in the apartment between their departure and Conason's arrival; and that he did not know of any person named Suzuki Oki. A neighbor similarly testified that the apartment was vacant in the summer and fall of 2003. Additionally, DHCR records disclosed that Rivera was the registered tenant in 2002 under a lease expiring on September 30, 2003. As noted by the Judge later in her opinion, DHCR's rent registration records identify the legal regulated rent for tenants' apartment in 2002 as $475.24 a month. As for Ku, Civil Court summarized his testimony as follows:

> "[Ku] . . . testified that he had no records at all for Suzuki Oki. He had no lease, no rental application, and no evidence of payment by Suzuki Oki. He did not establish a security deposit account for Suzuki Oki and he claimed she paid him only in cash. He

also claimed she remained in the apartment for only two months . . . Finally, [Ku] testified that although Oki was in the apartment for only two months, he completely renovated the apartment and claimed a rent increase for individual apartment improvements both before her tenancy and after it."

The Judge called Ku's testimony "entirely incredible."

The Judge next commented that "[o]rdinarily" a rent overcharge claim is governed by a four-year statute of limitations. Further, "[t]he legal regulated rent is defined as the rent actually charged and paid on the base date, four years prior to the interposition of the overcharge claim, plus any legal increases taken thereafter." Here, she opined, the claim was interposed on April 9, 2009, when the summary nonpayment proceeding commenced,[3] which made April 9, 2005 the base date, and the evidence failed to show any impermissible rent increases after that date.

The Judge then cited *Grimm* for the proposition that "where the rent on the base date is affected by fraud, the DHCR (and, by implication, [Civil Court], which has concurrent jurisdiction with the DHCR over rent overcharge claims) has an obligation to investigate the legality of the base date rent." She opined that *Grimm* "clearly . . . appli[ed]" because Megan "created an entirely fictitious tenant [i.e., Suzuki Oki] and at least one entirely fictitious apartment renovation in 2003 in order to boost the regulated rent from $475.24 per month . . . to $1[,]800.00." Consequently, the "rent on the base date was obviously affected by [Megan's] fraud."

Referring to *Thornton*, the Judge reiterated that she was required to dismiss tenants' overcharge claim without prejudice because they had not submitted proof of the lowest rent charged for a comparable apartment on the base date (*Thornton*, 5 NY3d at 179-180, 180 n 1 [where no reliable rent history is available, the courts must apply DHCR's default formula and set the rent on the base date as the lowest rent charged

---

3. As noted previously, Conason first alleged an overcharge in a counterclaim in her answer, dated April 24, 2009. CPLR 203 (d) provides that "[a] defense or counterclaim is interposed when a pleading containing it is served." Here, the record on appeal does not disclose when the answer was served, although presumably this happened shortly after April 24th. Whether the base date falls early or late in the month of April 2005 would seem to make no practical difference.

for a rent-stabilized apartment with the same number of rooms in the same building as the subject apartment]). The Judge did, however, find "ample evidence" that Megan had breached the warranty of habitability from January 2004 through the time of trial. Accordingly, Civil Court awarded tenants damages in the principal sum of $23,249.76 in rent abatement, and ordered Megan to correct any remaining outstanding code violations on or before May 15, 2011. And after a hearing, on July 6, 2011, Civil Court also awarded attorneys' fees to tenants in the principal sum of $53,193.75.

Megan appealed both the April 8th and July 6th orders and the judgments entered thereon. By decision dated November 15, 2012, the Appellate Term dismissed the appeal from the April 8th order and judgment, observing that no appeal lies from a default, which is what occurred, "as essentially conceded by [Megan], a limited liability company [that] failed to appear at trial by replacement counsel, despite ample opportunity to do so" (37 Misc 3d 135[A], 2012 NY Slip Op 52117[U], *1 [App Term, 1st Dept 2012]). The court modified the July 6th judgment to reduce the award of attorneys' fees from $53,193.75 to $44,200.19 to correct a mathematical error.

### This Lawsuit

On June 13, 2011, tenants commenced this action against Megan and Ku (collectively, defendants), seeking a money judgment for rent overcharge, including treble damages "for the period April 2007 to April 2009" for willful rent overcharge, and attorneys' fees. By motions dated June 15, 2012, the parties separately sought summary judgment. Tenants requested summary judgment on their overcharge cause of action and attorneys' fees. They also asked Supreme Court for a declaration piercing the corporate veil of Megan to reach Ku's personal assets. Defendants sought dismissal of the complaint and an award of costs, disbursements and attorneys' fees.

In a decision and order dated October 10, 2012, Supreme Court granted tenants summary judgment against defendants on the issue of liability with respect to their overcharge claim and directed an assessment of damages; ordered the issue of reasonable attorneys' fees held in abeyance until damages were determined; and denied defendants' motion for summary judgment (2012 NY Slip Op 32625[U] [Sup Ct, NY County 2012]). Citing *Matter of Cintron v Calogero* (15 NY3d 347 [2010]), the Judge first held that tenants' claim was not time-barred

because "rather than calculating the statutory period from the commencement of the overcharge, such claims are determined backwards, from the date of the first claim of an overcharge" (2012 NY Slip Op 32625[U], *8). Like Civil Court, Supreme Court identified April 9, 2005—four years prior to the date when Megan commenced the summary proceeding—as the base date. The Judge concluded that although the rent charged for the comparable apartment proposed by tenants (and not disputed by defendants) was the lawful rent on the base date,[4] tenants did not make clear whether they had actually received any portion of the rent abatement awarded by Civil Court, or had considered any lawful rent increases over the relevant four-year period. She therefore decided to conduct a hearing to decide the amount of tenants' overcharge damages.

Next, Supreme Court concluded that Megan had a full and fair opportunity to be heard in the Civil Court proceeding and was therefore "collaterally estopped from challenging the Civil Court's determination that the base date . . . is April 9, 2005 and that the rent charged to [tenants] was fraudulently established" (*id.* at *11-12). Further, in light of the fraud, tenants were entitled to both treble damages and attorneys' fees. Finally, the Judge held that tenants had met their burden to pierce the corporate veil and therefore Ku was personally liable for their damages. She emphasized that Ku owned 99% of Megan, which fraudulently set a rent for tenants' apartment to their detriment.

Upon defendants' appeal, the Appellate Division unanimously affirmed (109 AD3d 724 [1st Dept 2013]). Citing its decision in *Grimm* (68 AD3d 29 [1st Dept 2009]) and our decision in *Thornton*, the Court held that "the four-year statute of limitations is not a bar in a rent overcharge claim *where there is significant evidence of fraud on the record*"; and that Supreme Court "correctly found that defendants were collaterally estopped from arguing that no fraud existed[,] . . . [and] properly determined the base rent based on the default formula, and deferred the determination of the amount of the overcharge for a hearing" (109 AD3d at 726 [emphasis added and citation omitted]). The Court further concluded that Supreme Court had "properly pierced the corporate veil," noting that there was "evidence that, through Megan, Ku fraudulently set a rent for [tenants']

---

4. The record discloses that the monthly rent for this apartment in April 2005 was $180.92.

apartment and that [tenants] were financially injured thereby"; and "properly awarded treble damages and attorneys' fees" (*id.* [citation omitted]). On December 12, 2013, the Appellate Division denied defendants' motion to reargue and certified the following question to us: "Was the order of [the Appellate Division], which unanimously affirmed the order of Supreme Court, properly made?"

## II.

### The Four-Year Statute of Limitations

CPLR 213-a fixes a four-year statute of limitations for claims of residential rent overcharge; specifically, this provision states that

> "[a]n action on a residential rent overcharge shall be commenced within four years of *the first overcharge alleged* and no determination of an overcharge and no award or calculation of an award of the amount of any overcharge may be based upon an overcharge having occurred more than four years before the action is commenced. This section shall preclude examination of the rental history of the housing accommodation prior to the four-year period immediately preceding the commencement of the action" (emphasis added; *see also* Rent Stabilization Law of 1969 [Administrative Code of City of NY] § 26-516 [a] [2]; Rent Stabilization Code [9 NYCRR] §§ 2520.6 [f]; 2526.1 [a] [2]).

Defendants interpret section 213-a to mean that "after four years of having *first* paid an allegedly unlawful rent, recovery for rent overcharge is time[-]barred" (emphasis added). Stated slightly differently, they take the position that an overcharge claim invariably accrues when a tenant first pays allegedly unlawful rent. Consequently, they reason, because Conason's tenancy began on November 1, 2003, the statute of limitations on tenants' overcharge claim expired on October 31, 2007, about a year and a half before Megan commenced the summary nonpayment proceeding.[5] Conversely, tenants contend that they may recover any overcharges that they paid during the four-

---

**5.** Defendants similarly contend that the Appellate Division improperly allowed treble damages to be recovered on overcharge claims interposed more than two years after the first overcharge alleged. But that Court did not discuss treble damages other than to state that Supreme Court properly

year period immediately preceding Conason's rent challenge. Our decisions in *Thornton* and *Grimm* dictate the resolution of the parties' dispute about how the four-year statute of limitations in CPLR 213-a works in this case.

The building owner in *Thornton* entered into a nonstabilized lease with Baron in 1992, ostensibly permitted as a temporary exemption from rent stabilization for nonprimary residences. Baron, whose initial monthly rent was $2,400, almost immediately sublet the apartment to the Thorntons at the still higher initial rent of $3,250 per month. Baron never lived in the apartment and the Thorntons always lived there as full-time residents. Although the Thorntons were willing participants in this scheme to skirt rent stabilization, they sued Baron in 1996, claiming rent overcharges, and amended their complaint in November 2000 to add the owner as a named defendant. We were required to decide the proper way to determine the apartment's legal regulated rent.

The Thorntons contended that their rent should be $507.85 per month, the legal regulated rent in 1992, immediately preceding Baron's illusive nonprimary tenancy. The owner contended that the courts were obligated to use $2,496 per month, the rent charged to Baron in 1996 and reflected in the annual registration statement filed with DHCR on July 31, 1996, i.e., four years before the Thorntons sued the owner. In making this argument, the owner relied on the Rent Regulation Reform Act of 1997 (RRRA) (L 1997, ch 116), which "clarified and reinforced the four-year statute of limitations applicable to rent overcharge claims by limiting examination of the rental history of housing accommodations prior to the four-year period preceding the filing of an overcharge complaint" (*Thornton*, 5 NY3d at 180 [citation omitted]). A base date in 1996 would have eliminated any possibility for the Thorntons to recover overcharges from the owner because increases and adjustments of the rent from 1996 to 2000 appear to have been lawful.

---

awarded them (and attorneys' fees) because defendants failed to prove by a preponderance of the evidence that the rent overcharge was not willful (109 AD3d at 726-727). Tenants' complaint sought treble damages "for the period April 2007 to April 2009" (i.e., roughly, the two years before Conason counterclaimed to recover overcharges) (*see* Rent Stabilization Law of 1969 [Administrative Code of City of NY] § 26-516 [a] [2] [i]). In any event, Supreme Court has not yet fixed tenants' overcharge damages, treble or otherwise; the Judge has only determined the lawful rent on the base date, to be used to compute these damages.

We disagreed with both approaches, and held that DHCR should use its default formula to determine the lawful rent in 1996 (*id.* at 179-181). The illusory nature of Baron's tenancy was the decision's raison d'être. We commented that "[r]eflecting an attempt to circumvent the Rent Stabilization Law in violation of the public policy of New York, the Baron lease was void at its inception"; and "because the rent it purported to establish was therefore illegal, the 1996 rent registration statement listing this illegal rent was also a nullity" (*id.* at 181).

Significantly, the Thorntons did not sue the owner within "four years of having first paid an allegedly unlawful rent," as defendants and the dissent insist CPLR 213-a mandates. Indeed, they waited more than seven years. Defendants point out that the Thorntons sued Baron, the tenant, within four years after they commenced their tenancy. We specifically "reject[ed]," however, "[the Thorntons'] contention that their amended complaint against [the owner] should relate back to the original complaint filed against [Baron] in October 1996" (*id.* at 180 n 2). And we at least implicitly rejected the owner's protest that because the Thorntons' overcharge claim arose in 1992, we were flouting the legislature's intent, when it enacted the RRRA, to make sure that owners were not left forever potentially liable for overcharge claims; specifically, we declined to read the four-year limitations period in a way that would allow "a landlord whose fraud remains undetected for four years-- however willful or egregious the violation--[to], simply by virtue of having filed a registration statement, transform an illegal rent into a lawful assessment that would form the basis for all future rent increases" (*id.* at 181).

The dissent criticized the majority for "uphold[ing] a challenge to the amount of rent set forth in a registration statement, although the challenge was brought more than four years after the registration statement was filed"; and for taking an approach that "destroy[ed] the effectiveness of the four-year time limitation, which has no point unless it protects illegal rents against challenge" (*id.* at 182). Additionally, the dissent observed that "[i]f a rent is not illegal, a challenge will fail anyway and the four-year limit is unnecessary" (*id.*). Further, "the [Thorntons'] remedy was *to challenge the rent established by the 1992 lease within four years*, and nothing prevented them from doing so" (*id.* at 183 [emphasis added]). This, of course, is the same position espoused by defendants and the dissent in this case.

Next, we were asked in *Grimm* "whether the rationale employed in [*Thornton*], which allowed the parties to look back farther than four years, applies in a situation where it is alleged that the standard base date rent is tainted by fraudulent conduct on the part of a landlord" (*Grimm*, 15 NY3d at 362). We answered in the affirmative, concluding that "such base date rent may not be used as a basis for calculating subsequent regulated rent *if fraud is indeed present*" (*id.* [emphasis added]).

The apartment in *Grimm* was registered as rent-stabilized in 1999 at a legal regulated rent of $578.86. In 2000, the landlord increased the rent to $2,000 per month, but informed the incoming tenants that if they agreed to make certain repairs and improvements, the monthly rent would be reduced to $1,450; they agreed to this arrangement. When Grimm moved into the apartment in 2004, she also paid rent of $1,450 per month. In April 2005, she entered into a renewal lease at a monthly rent of $1,500.75. Grimm subsequently filed a rent overcharge complaint with DHCR in July 2005; she complained that the "owner is fraudulently renting [the] apartment as a non-rent stabilized unit and raised [the] rent illegally in 2005. [The] [i]nitial 2004 rent is also illegal." When DHCR denied Grimm's complaint because the rent adjustments after the base date (July 2001) were lawful, she brought a CPLR article 78 proceeding to challenge the agency's determination.

DHCR argued that *Thornton* should be limited to "the narrow set of circumstances described in that case . . . involving illusory tenancies" (*id.* at 366). We disagreed, and held that "where the overcharge complaint alleges fraud . . . DHCR has an obligation to ascertain whether the rent on the base date is a lawful rent," and that DHCR had not met this obligation because "there existed substantial indicia of fraud on the record," yet DHCR "blindly us[ed] the rent charged on the date four years prior to the filing of the rent overcharge claim" (*id.*). We cautioned that

> "[o]ur holding should not be construed as concluding that fraud exists, or that the default formula should be used in this case. Rather, we merely conclude that DHCR acted arbitrarily in disregarding the nature of [Grimm's] allegations and in using a base date without, at a minimum, examining its own records to ascertain the reliability and the

legality of the rent charged on that date" (*id.* at 366-367).

Further, "[g]enerally, an increase in the rent alone will not be sufficient to establish a colorable claim of fraud, and a mere allegation of fraud alone, without more, will not be sufficient to require DHCR to inquire further" (*id.* at 367 [internal quotation marks omitted]).

The dissent accused the majority of going "far beyond" *Thornton* and *Cintron*, a case where two rent reduction orders issued within four years of the start of the rent-stabilized tenancy remained in effect when the tenant filed an overcharge complaint more than a decade later.[6] In the dissent's view, the majority had improperly equated "fraud" with a willful overcharge, and if it had not essentially repealed the four-year limitations period—a charge the majority took pains to reject—it had created a situation where, if fraud is alleged and substantial indicia of fraud exist on the record, DHCR would be compelled to conduct a "mini-litigation . . . to figure out whether the overcharge was 'fraudulent' enough to escape the time limit" (*id.* at 369).

■ Here, tenants do not just make a generalized claim of fraud. They instead advance a colorable claim of fraud within the meaning of *Grimm*—i.e., tenants alleged substantial evidence pointing to the setting of an illegal rent in connection with a stratagem devised by Megan to remove tenants' apartment from the protections of rent stabilization (*compare Matter of Partnership 92 LP v State of N.Y. Div. of Hous. & Community Renewal*, 11 NY3d 859, 860 [2008] [where there was "ample basis" in the record for DHCR to "conclude that, in arguing for a higher base rent, the owner had relied on an illusory tenancy," the agency properly set the base rent using its default formula], *with Matter of Boyd v New York State Div. of Hous. & Community Renewal*, 23 NY3d 999 [2014] [DHCR properly declined to examine the apartment's rental history for fraud where a tenant merely alleged that the registered monthly rent increased from $572 in July 2004 to $1,750 in October 2004]). In light of *Thornton* and *Grimm*, Supreme Court in this case properly considered tenants' counterclaim alleging rent overcharges notwithstanding expiration of the four-year statute of limitations to which such claims are generally subject

---

6. Thus, *Cintron* involves the interplay of rent reduction orders—not fraud—and the four-year statute of limitations, although both Supreme Court and tenants relied on it.

(*see Mozes v Shanaman*, 21 AD3d 854 [1st Dept 2005], *lv denied* 6 NY3d 715 [2006] [CPLR 213-a barred the plaintiff sublessees' overcharge complaints brought more than four years after each of their separate tenancies commenced]).

The dissent protests that neither *Thornton* nor *Grimm* carved out a fraud exception from CPLR 213-a's bar of overcharge claims interposed more than four years after the first overcharge alleged, and that in *Thornton* we "avoided" this question (dissenting op at 20). We hardly avoided the question, however, as we allowed the Thorntons to pursue a lawsuit against the owner for overcharges more than seven years after the first overcharge alleged, over the owner's strong objections. The dissent in *Thornton* certainly recognized this when remonstrating that the Thorntons should have "challenge[d] the rent established by the 1992 lease within four years" (*Thornton*, 5 NY3d at 183). Similarly, although the dissent frets that our decision today "will have several serious and troublesome ramifications" (dissenting op at 21), the potential untoward consequences mentioned are the same as those identified in the *Thornton* and *Grimm* dissents. In short, the arguments advanced and policy concerns expressed by the dissent here were considered and rejected by the majorities in *Thornton* and *Grimm*, as the dissenting opinions in those cases make abundantly clear.

## Collateral Estoppel

Defendants argue that the lower courts incorrectly applied the doctrine of collateral estoppel to foreclose them from contesting Civil Court's findings of fraud, which underpin the Judge's determination of liability and the awards of treble damages and attorneys' fees. Collateral estoppel comes into play when four conditions are fulfilled:

> "(1) the issues in both proceedings are identical, (2) the issue in the prior proceeding was actually litigated and decided, (3) there was a full and fair opportunity to litigate in the prior proceeding, and (4) the issue previously litigated was necessary to support a valid and final judgment on the merits" (*Alamo v McDaniel*, 44 AD3d 149, 153 [1st Dept 2007], citing *Ryan v New York Tel. Co.*, 62 NY2d 494 [1984], and *Gramatan Home Invs. Corp. v Lopez*, 46 NY2d 481 [1979]).

■ Civil Court seems to have made findings of fraud to support the conclusion that tenants had shown "an actionable overcharge." The Judge nonetheless dismissed tenants' overcharge claim, without prejudice, because they had not submitted proof of the lawful rent on the base date, as is necessary to compute overcharge damages. Consequently, Civil Court's findings of fraud are not entitled to preclusive effect because two of the four prerequisites for collateral estoppel are unmet: the issues in Civil Court (breach of the warranty of habitability) and Supreme Court (evidence of fraud sufficient to render the rent on the base date unreliable) are not identical (the first condition), and findings of fraud were not necessary to support the judgment entered on the April 8th order, which awarded tenants rent abatement on account of Megan's breach of the warranty of habitability and directed Megan to remedy code violations (the fourth condition).

As tenants urge, however, the trial record in Civil Court is replete with evidence of the illegality of the rent charged by Megan for tenants' apartment on the base date. This evidence is unrefuted. And Megan enjoyed ample opportunity to contest tenants' proof at trial, despite defendants' protestations to the contrary. As a result, whatever the minimum scope of the inquiry that must be made by the courts or DHCR to resolve an overcharge claim where fraud has been alleged and there exist substantial indicia of fraud on the record, and whatever minimum quantum of evidence is required for a tenant to establish fraud sufficient to taint the reliability of the rent on the base date (*see Grimm*, discussed earlier), these thresholds have been crossed here: Civil Court made extensive findings of fraud based on a record developed at a trial, which afforded both sides the opportunity (even though shunned by defendants) to submit evidence and present and cross-examine witnesses regarding the apartment's rental history.

### Piercing the Corporate Veil

■ Generally, a plaintiff seeking to pierce the corporate veil must show that "(1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury" (*Matter of Morris v New York State Dept. of Taxation & Fin.*, 82 NY2d 135, 141 [1993]). Here, questions of fact remain about whether Ku, through his undoubted domination of Megan,

abused the corporate form to commit a wrong or fraud causing injury to tenants.

We have reviewed defendants' remaining arguments and consider them to be meritless.

Accordingly, the order of the Appellate Division should be modified, without costs, by remitting to Supreme Court for further proceedings in accordance with this opinion and, as so modified, affirmed, and the certified question answered in the negative.

PIGOTT, J. (dissenting). The majority holds, apparently on the basis of *Thornton v Baron* (5 NY3d 175 [2005]) and *Matter of Grimm v State of N.Y. Div. of Hous. & Community Renewal Off. of Rent Admin.* (15 NY3d 358 [2010]), that because the tenants "advance a colorable claim of fraud within the meaning of *Grimm* . . . Supreme Court in this case properly considered tenants' counterclaim alleging rent overcharges notwithstanding expiration of the four-year statute of limitations to which such claims are generally subject" (majority op at 16). *Thornton* and *Grimm* do not support that conclusion, and there are strong policy considerations why.

In *Thornton*, this Court held that a lease provision circumventing rent stabilization was void as against public policy, and that the rent registration statement in effect on the base date listing the illegal rent was "a nullity" (*Thornton*, 5 NY3d at 181). We instructed DHCR to use a default formula to calculate the rent on the base date, which "uses the lowest rent charged for a rent-stabilized apartment with the same number of rooms in the same building on the relevant base date" (*id.* at 180 n 1). The Court expressly noted that "[o]nly one question is before us: How is the legal regulated rent of the apartment to be established?" (*Id.* at 180.) The majority opinion did not decide the statute of limitations issue—the lawsuit was brought more than seven years after the first alleged overcharge—and indeed the dissent pointed out that the majority "ignore[d] the four-year limitation" (*id.* at 183 [Smith and Read, JJ., dissenting]).

In *Grimm*, we held that where "substantial indicia of fraud [exist] on the record" and "the overcharge complaint alleges fraud, . . . DHCR has an obligation to ascertain whether the rent on the base date is a lawful rent" (*Grimm*, 15 NY3d at 366). In that case, however, petitioner's action was not barred by the statute of limitations, since it was brought well within four years following the first alleged rent overcharge. The ques-

tion was whether DHCR could examine the rental history of the housing accommodation prior to the four-year period preceding the filing of a complaint, so as to determine whether the rent on the base date was itself an overcharge. We said it could and should, but, necessarily, we did not address the statute of limitations. The Court "merely conclude[d] that DHCR acted arbitrarily in disregarding the nature of petitioner's allegations and in using a base date without, at a minimum, examining its own records to ascertain the reliability and the legality of the rent charged on that date" (*id.* at 367).

The appeal before us now raises the question the Court avoided in *Thornton* and had no need to address in *Grimm*, namely whether CPLR 213-a precludes an action on a residential rent overcharge commenced more than four years after the first alleged overcharge. Yet, the majority gives no justification for its holding other than the two abovementioned Court of Appeals cases that do not support it.

The statute is abundantly clear. Under CPLR 213-a, as amended in 1997:

> "[a]n action on a residential rent overcharge *shall be commenced within four years of the first overcharge alleged* and no determination of an overcharge and no award or calculation of an award of the amount of any overcharge may be based upon an overcharge having occurred more than four years before the action is commenced. This section shall preclude examination of the rental history of the housing accommodation prior to the four-year period immediately preceding the commencement of the action" (emphasis added).

Regardless of whether the action is brought as an administrative or judicial claim, "a rent overcharge claim is subject to a four-year statute of limitations" (*Matter of Cintron v Calogero*, 15 NY3d 347, 353 [2010]; *see also e.g. Matter of Brinckerhoff v New York State Div. of Hous. & Community Renewal*, 275 AD2d 622 [1st Dept 2000], *lv denied* 96 NY2d 712 [2001]; *Mozes v Shanaman*, 21 AD3d 854 [1st Dept 2005], *lv denied* 6 NY3d 715 [2006]; *Direnna v Christensen*, 57 AD3d 408 [1st Dept 2008]).

The majority now rewrites the statute, so as to delete the first clause ("[a]n action on a residential rent overcharge shall be commenced within four years of the first overcharge alleged"), with the result that "section 213-a merely limits ten-

ants' recovery to those overcharges occurring during the four-year period immediately preceding Conason's rent challenge" (majority op at 6). In effect, the Court has simply removed the statute of limitations from the statute. In doing so, it overlooks the well-established principle that, irrespective of whether the misconduct alleged is minor or heinous, "actions are subject to the time limits created by the Legislature" and "[a]ny exception to be made to allow these types of claims to proceed outside of the applicable statutes of limitations would be for the Legislature" to enact (*Zumpano v Quinn*, 6 NY3d 666, 677 [2006]).

The majority's decision will have several serious and troublesome ramifications. Rent records will be subject to challenge indefinitely. Property owners and buyers will have no certainty as to the value of residential rental property. Landlords will have to keep evidence of rent charges indefinitely, in order to preserve their ability to defend against fraudulent rent overcharge claims. And endless litigation will ensue concerning whether tenants are making "a colorable claim of fraud within the meaning of *Grimm*," before any complaint challenging years-old rents can be dismissed.

I would reverse the order of the Appellate Division and hold that Conason's complaint should have been dismissed as barred by the statute of limitations. Accordingly, I would not reach the collateral estoppel and piercing the corporate veil issues and I do not join the Court's opinion as to the merits of those claims.

Chief Judge LIPPMAN and Judges RIVERA and ABDUS-SALAAM concur; Judge PIGOTT dissents and votes to reverse and dismiss the complaint in an opinion; Judges STEIN and FAHEY taking no part.

Order modified, without costs, by remitting to Supreme Court, New York County, for further proceedings in accordance with the opinion herein and, as so modified, affirmed, and certified question answered in the negative.